ABRAHAM E. FRANTZ vs. THE GIRARD LIFE INSURANCE, ANNUITY AND TRUST COMPANY OF PHILADELPHIA.

*Deceit—Evidence—Receiver—Agency—Fraud—False Representations; Knowledge of; Relying on—Matter of Fact—Point of Law—Nonsuit; When Granted; When Refused.*

Wherever the testimony, taken as a whole, together with all reasonable, lawful inferences that could be drawn from it, would not support the verdict of a jury, if it should find in favor of the plaintiff, a nonsuit will be granted; if it would support such a verdict, then a nonsuit will not be granted. The Court are always very reluctant to take a case away from the jury, if there be testimony sufficient to warrant such a verdict.

(*March 6, 1900.*)

LORE, C. J., and PENNEWILL and BOYCE, J. J., sitting.

*William S. Hilles* for plaintiff.

*George Tucker Bispham, Robert H. Maxwell,* (both of the Philadelphia bar) and *James H. Hoffecker, Jr.,* for defendant.

Superior Court, New Castle County, November Term, 1900.

ACTION OF DECEIT (No. 6, November Term, 1898).

At the trial Jacob E. Frantz, the brother of the plaintiff, testified that he was president of the Wilmington Dental Manufacturing Company a corporation of the State of Delaware, from the time of its incorporation in 1882, until the appointment of the receiver for said company on the 27th of July, 1893; that at the last mentioned date the defendant company was appointed receiver. That the principal office of the Wilmington Dental Manufacturing Company was at 1010 King Street, Wilmington, Delaware, with branch houses in various cities, and that the business of the company, in a general way, was manufacturing porcelain teeth and dental instruments and dealing in dental supplies generally. That the Wilmington Dental Manufacturing Company owed to one H. M. B. Barry about $40,000, which indebtedness was evidenced by notes given by the Wilmington Dental Manufacturing Company in varying amounts, one of which notes dated July 3, 1893, contained the following collateral clause: "On demand we promise to pay to the order of H. M. B. Barry $7,345.87 without defalcation for value received; having deposited herewith seven hundred and eighty-five and $\frac{55}{100}$ ounces dental platinum wire which we authorize the holder of this note, upon the nonperformance of this promise at maturity, to sell, either at the Broker's Board or at public sale or private sale," etc. Another note under date November 10, 1891, for $10,000, between the same parties contained a collateral clause pledging 1000 shares of the capital stock of the Wilmington Dental Manufacturing Company so held by said Barry and said stock was delivered to him. Both of the above mentioned notes were admitted in evidence.

The witness further testified that after the appointment of the receiver, the active representative of the Girard Life Insurance, Annuity and Trust Company of Philadelphia, in its dealings with the Wilmington Dental Manufacturing Company and

its officers, was Henry Tatnall, the vice-president of said
defendant company, and that the witness was clothed with written
authority by the defendant company by a paper designated as
" General Order No. 1," dated July 1, 1893, as follows: " Dr. J.
F. Frantz shall advise with the receiver and have general super-
vision of the affairs of the company under specific directions from
the receiver, with office at No. 1413 Filbert street;" that he
assumed the duties so conferred and continued to perform the same,
beginning with the appointment of the receiver in 1893, down to
1895. That for the first few months after the appointment of the
receiver, he had frequent lengthy verbal communications with Mr.
Henry Tatnall, vice-president of the defendant company, both in
the latter's office, in the Girard Trust Company's building, in
Philadelphia, and in the office of the witness at 1413 Filbert street,
and also in Wilmington; the subject matter of the conversations
pertaining to the Barry obligation and the retirement of the block
of stock which was held as collateral thereto.

The witness then continued:
"This one thousand shares of stock was held as collateral in
addition to all the obligations to Mr. Barry, of the Wilmington
Dental Manufacturing Company, and was really pledged on the
note of 1891 for $10,000, on which a portion had been paid. Mr.
Tatnall told me that it was very important for the interests of the
business, for the satisfactory conduct of the business, that this obli-
gation of Mr. Barry be disposed of. He further informed me that
he had a conversation with Mr. Barry and had succeeded in making
an arrangement with him whereby Mr. Barry agreed to withdraw
a certain suit that he had instituted against the Wilmington Dental
Manufacturing Company if $10,000 was paid him. Mr. Tatnall
then told me that we must try and raise this $10,000; that in order
to insure the prompt realization of this amount from persons who
might be willing to advance it the Girard Trust Company (the
defendant) would petition the United States Court for the privilege

to take up such collateral as in the judgment of the Girard Trust Company it might be advisable to liquidate. The petition was drawn up and was presented to that Court. On the 7th day of August Mr. Tatnall handed me a paper which he told me gave the Girard Life Insurance, Annuity and Trust Company, as receiver, the authority to take up or pay off the obligations of the Wilmington Dental Manufacturing Company to which there was collateral. He told me that I could go to my friends whom I intended to solicit from or interest in the raising of this money, that if they would advance the $10,000 it would be a first claim or a preferred claim against the receiver of the Wilmington Dental Manufacturing Company, and would be paid out of the first money coming into their hands."

(Copy of the paper referred to by the witness, being the petition upon which the order of August 1893 of the United States Court was based, was here admitted in evidence, and the witness continues):

"Mr. Tatnall told me specifically that the prime object in obtaining that decree was for the purpose of giving them the authority to take up this Barry obligation for which this stock was collateral, in order that the suit entered by Mr. Barry might be amicably disposed of, and Mr. Tatnall requested of me that I exert myself as expeditiously as possible in raising this money for the purpose of disposing of the threatened trouble. I repeated practically all that Mr. Henry Tatnall told me pertaining to this loan to my brother, Dr. A. E. Frantz, for the purpose of interesting my brother and having him advance as much as he could advance towards taking up this $10,000 obligation. The contribution of my brother was $6,100, which I know was sent to the Girard Trust Company. Mr. Tatnall in the course of about two weeks came to the office of the Wilmington Dental Manufacturing Company, at 1413 Filbert Street, with the certificate of stock—the 1000 shares of the capital stock of the Wilmington Dental Manufacturing Company—which

he offered for cancellation or destruction; telling me that the $10,-000 which had been raised, $6,100 of which was contributed by my brother, had been used to take up the $10,000 obligation which Mr. Barry had. Up to the time of the contribution of the ten thousand dollars by the respective parties, for the taking up of this obligation, Mr. Tatnall told me that the money advanced was to be a preferred claim under the order of the Court, of which he had given me a copy; that is, the decree of August 7, 1893. After the collateral had been taken up and the notes had been given to the various parties—my brother of the number, and myself contributing something as well—I went to Mr. Tatnall's office and said, 'Mr. Tatnall, how about giving the parties who contributed the money some evidence of its being a preferred claim?' I had some conversation with him with reference to the receiver's certificates. which he said could be issued; however, it was then he told me that because of an objection entered by Mr. H. M. B. Barry to those contributions being made preferred over other creditors, he was obliged in order to get that stock back from Mr. Barry to surrender his intentions or change his intentions as expressed to me and accede to Mr. Barry's demands. Mr. Barry's demands were that these persons who contributed the ten thousand dollars should not be made preferred creditors, and that if he (meaning Mr. Tatnall) insisted upon their being made preferred creditors, he (meaning Mr. Barry) would not surrender the collateral; and Mr Tatnall said he assumed the responsibility, that there would be plenty of money to pay off all the obligations, and it would be all right; or words to that effect.

"That conversation was after the settlement had been made with Mr. Barry and the notes given to the respective contributors to the $10,000 fund. I had very little conversation with Mr. Tatnall on the subject after that interview, as our relations became rather strained and frigid."

*Mr. Hilles:*—" Q. Will you kindly state to the Court and the jury what Mr. Tatnall said, as nearly as you can recollect, in his

examination before Mr. Smith in the United States Court concerning this money being a preferred claim or concerning the preferences under the order of August 7, 1893?

" A. Mr. Tatnall's testimony, as I recall it, was in substance a complete denial of his ever having had any conversation with me promising or indicating that this should be a preferred claim under the decree of August 7, and that counsel had advised him that this could not be a preferred claim under the decree of August 7. He said he had that advice of counsel when the money was paid over by the contributors to those funds."

The plaintiff, Abraham E. Frantz, testified that he was a stockholder in the Wilmington Dental Manufacturing Company before the appointment of the receiver; that the first he knew of the note of the Wilmington Dental Manufacturing Company held by Mr. Barry and the stock pledged as collateral with that note was after the obtaining of the decree of the United States District Court for the District of Delaware, of August 7, 1893. That he got the information from his brother J. F. Frantz, then living in Wilmington and whom he saw quite frequently, as said J. F. Frantz was interested in the affairs of the company as a large stockholder. He afterwards got the same information from the Girard Trust Company as receiver. The witness then continued:

"I had the first conversation with my brother in relation to the matter shortly after the decree of August 7, 1893. He told me that Mr. Tatnall had instructed him to secure sufficient moneys from his friends and those interested to take up the obligation of $10,000 or thereabouts which Mr. Barry held against the Wilmington Dental Manufacturing Company, for which the said Barry held a thousand shares of the Wilmington Dental Company's stock; and that in so doing, Mr. Tatnall, acting under the powers and the order which he had secured from the United States Court, would repay to those contributors to that fund, the money out of the first funds coming into his hands as receiver. That was the substance of the conversation; my brother stating that the purpose

in applying for and getting the order was for the removal of the suit which had been instituted by Mr. Barry in the Court at Philadelphia, and the retiring of the stock of the Wilmington Dental Manufacturing Company; and that Mr. Tatnall was acting for the Girard Life Insurance Annuity and Trust Company of Philadelphia, and that the moneys would be preferred under the order of the Court of August 7, 1893.    From the 7th of August or the 8th of August, 1893, up until about the 20th or 21st of September of 1893, the matter was spoken of from time to time by my brother; that the raising of the money was not proceeding as satisfactorily as they would like to have it; that there was some money raised but not enough.    I had told my brother, Dr. J. F. Frantz, that I would raise a reasonable amount on my part to protect the interests which I myself had in the Wilmington Dental Manufacturing Company and assist in its reorganization and restoration to its own property.    The Girard Trust people wished to have this matter gotten out of the way, that is, this stock taken up as rapidly as possible.    I had made arrangements for attending the World's Fair on the 23d of September, 1893, and would possibly be away for two weeks; they were then about sixty-one hundred dollars short of the full amount.    I communicated with my brother, Andrew F. Frantz, at Lancaster, and as a result of this communication I met my brother, Andrew F. Frantz, and together we went to the office of the Girard Trust Company, at Broad and Chestnut streets, Philadelphia, and there saw Mr. Henry Tatnall, the vice-president of the Girard Trust Company.    I said, 'Good morning, Mr. Tatnall.'    He said 'Good morning, Mr. Frantz.' I suppose he was glad to see me.    'Mr. Tatnall, I will have to raise considerable of this money, this sixty-one hundred dollars, which you want, from my friends.    I think I can do so at Lancaster, Pennsylvania.    In the raising of this money, I may have the assistance of my brother, Andrew F. Frantz, whom I have brought here to-day to see you, and find out the status that this claim or this money will bear in the relations of the Wilmington Dental

Manufacturing Company's assets.' I said, 'Mr. Tatnall, you have the order of the Court, under which you will prefer and pay to us out of the first assets of the company which comes into your hands, this money back. So that the loan which we make at Lancaster will not be a long running loan.' Mr. Tatnall said, 'That is right,' and that they would repay us this money out of the first funds coming into their hands as receivers. That is the conversation we had with him. After that conversation, I went with my brother to Lancaster and raised $5,000 there which was sent from Lancaster to the Girard Life Insurance, Annuity and Trust Company of Philadelphia, it being borrowed from them by myself, and the balance was by a check sent by me from Wilmington, on September 23d, 1893, to the Girard Life Insurance, Annuity and Trust Company. In the early part of October I received a receipt from the Girard Trust Company and on the first day of November, 1893, a note for ninety days of the Wilmington Dental Manufacturing Company for sixty-one hundred dollars. That note was renewed at maturity and interest paid, and so on, renewals and payments of interest thereon, until May 1896. That was the last time the note was renewed. There is a credit on the note of $26.84, dividend. In July 1898 I had a conversation with Mr. Henry Tatnall in his office in Philadelphia in which I said: ' Mr. Tatnall, I want you to fulfill the promises which you made under the receivership, both through yourself and my brother, to me in the matter of the repayment to me of the full amount of $6,100 advanced to you.' Mr. Tatnall said that while that might have been the original intention he could not possibly do so legally. I told him that certainly I should hold him, and would hold the Girard Trust Company liable for any deficiencies which occurred in connection with the transaction, as Mr. Tatnall had promised and agreed, acting under the order of the Court which he showed to us and under which and through which he obtained our money in 1893. He said that I should go home and write a letter to him, which I did. The letter was as follows:

'WILMINGTON, DEL., July 8, 1898.

'*Girard Life Ins., Annuity and Trust Company:*

'GENTLEMEN—I hold a $6100 (original) note of the Wilmington Dental Manufacturing Company. Said note was sold to me by you with the guarantee of your company that it was and would be a preferred claim.

'I hold you liable for any deficiency which may occur in this transaction.

'Very truly,

'A. E. FRANTZ.'

"As a result Mr. Tatnall told me, on the 8th of July (for this was written on the same evening) that he would refer my letter to their attorney, to see what could be done. In 1898 I received the following letter from their attorney:"

'In re Wilmington Dental Mfg. Co. Receivership.

'*Dr. A. E. Frantz, 504 Delaware Avenue, Wilmington, Del.,*

'DEAR SIR—On my return to Philadelphia I have been consulted by Mr. Tatnall, the vice-president of the Girard Life Ins., Annuity and Trust Company, as to your letter to the company of July 8th last, which letter he has handed to me.

'I am informed by Mr. Tatnall that neither he nor the Girard Company, nor any one else in its behalf, gave you any guarantee or assurance, written or verbal, of any sort or kind, that the note of $6100 mentioned in your letter was or would be a preferred claim. I have advised the company, therefore, that it is under no liability whatsoever to you in respect to the said note, and beg to notify you to that effect.

'Truly yours,

'GEO. TUCKER BISPHAM.'

"Forty-four per cent. was paid in the first dividend by the receivers. Under the second dividend there will be 17 and $\frac{8}{10}$ or $\frac{9}{10}$ per cent. additional, which will be the final dividend."

The plaintiff admitted on cross-examination that he had examined the order of the Court dated August 7, 1893, during the same month and kept himself as well posted as he could as to what was going on in the suit under which the Trust Company was appointed receiver, and examined probably some other papers in connection with the company, as he was largely interested in it, and that he went down to the United States Court House at Sixth and King streets, and was shown the petition and order of the Court by the Clerk of the Court, and on that evidence felt justified in assisting the company to the extent of $6100.

When the plaintiff rested, defendant's counsel moved for a nonsuit for the following reasons:

1. The plaintiff has not alleged or proved, or offered any testimony to prove, that the alleged representations were false when alleged to have been made.

2. The plaintiff has neither alleged nor proved (a scienter) that defendant or its officer knew the alleged representations were false when alleged to have been made.

3. The only breach alleged or attempted to be proved was that the plaintiff was not paid the full amount of his claim in preference to other creditors, in accordance with the alleged promises of the defendant's vice-president.

4. Even if it be admitted for sake of argument, that the plaintiff has proved what, as a matter of fact he has neither alleged nor attempted to prove, viz: (1) that the alleged representations were false; (2) that the defendant or its officer knew them to be false; (3) and that the plaintiff acted upon said representations to his damage—he has nevertheless not made out a case to go to the jury, because:

(a) The alleged representations were at most merely representa-

tions as to the proper construction of an order of Court and, there-
fore, constituted only an opinion upon a matter of law; and for such
a representation, no matter how false or fraudulent, there can be no
recovery.

(b) Even if such representation had been as to a matter of
fact, the plaintiff's means of knowledge were equal to, and co-ex-
tensive with that of the defendant and its officer, and it was there-
fore the plaintiff's own folly to rely on such representations.

(c) According to the plaintiff's own testimony, he did not rely
on the representations of the defendant and its officer, but upon his
own examination of the order of the United States Circuit Court
for the District of Delaware, and his own interpretation of it.

The fact that the defendant's vice-president agreed with him
in his interpretation of said order and assured him that the order
meant what the plaintiff thought it did, is not a false representation
of a matter of fact but a mere opinion on a point of law, which, no
matter how false or fraudulent, gives the plaintiff no right of action.

*Hilles*, for plaintiff:—Where a man makes a statement to be
acted on by others which is false, and which is known by him to be
false, or where such statement is made by him recklessly or without
care, whether it is false or true, that is, without any reasonable
ground for believing it to be true, he is liable to an action for deceit.

*Deery vs. Peak, 14 App. Cas., 337.*

It is immaterial that the defendant may not have benefited,
or have expected to have been benefited, by the deceit.

*3 Wait's Actions and Defenses, 453, and cases cited; 12 Eng.
Rul. Cas., 294.*

The principal is responsible for the fraudulent statements of
an agent made in the course of his authority, and if authorized by
the principal.

*Bannock vs. English Joint Stock Bank, L. R. 2 Exch., 259;
Udell vs. Atherton, 7 H. and N., 172; Ranger vs. Co., 5 House of
Lords Cases, 86.*

While it is necessary that the plaintiff should have relied upon

the false representations, and been induced thereby to take the action complained of, it is not necessary that such false representations should have been the only inducement to his action.

*Thomas vs. Grise, 1 Pennewill 381 and 386.*

The object or intention stated by the defendant for which certain things are done may be, and frequently is, a representation of a fact; and whether such is or is not the case is usually a question for the jury.

*Edgerton vs. Fitzmaurice, 29 Chan. Div. L. R., 459 ; Morse vs. Shaw, 124 Mass., 59; Tigg vs. Irwin, 127 Mass., 217; Wilson vs. R. R., 5 Houst., 49.*

The representation that the Girard Trust Company as receiver had obtained an order of Court, under which it was authorized to do certain things, was a representation of fact and not merely of opinion as to the meaning of the order.

*Deery vs. Peek, 14 App. Cas, 337; Gearhardt vs. Bates, 2 El. Bl., 474; Beckwith vs. Ryan, 66 Conn., 589; Murray vs. Tolman, 162 Ill., 417.*

The Girard Trust Company in this case, as receiver of the Wilmington Dental Manufacturing Company, stood in a trust relation to Frantz, the plaintiff in this suit.

*Thompson on Corporations, Secs 6939 and 6945 ; High on Receivers, Sec. 314; Bigelow on Fraud, 248.*

Where a relation of trust, or confidence, exists between parties, a party contracting with the trustee may rely upon statements made to him by such trustee without independent investigation of his own, if he be not guilty of disregarding the knowledge which he should possess or obtain.

*Bigelow on Fraud, 9 and 10; Merritt vs. Wassenich, 49 Fed., 785; Picard vs. McCormick, 11 Mich., 68; Headon vs. Institute, 62 Minn., 146; Cressler vs. Rees, 27 Neb., 515; Drake vs. Grant, 36 Hun., 464.*

A party may rely, if he be not guilty of carelessness and disregard of his own interests, upon an express statement of fact made

by one having the opportunity to know and who should know such fact.

*Bigelow on Fraud, 67.*

The general rule that statements of opinion do not amount to fraud if false in themselves does not apply when a person, with intent to deceive, falsely expresses an opinion as to a material fact which is susceptible of knowledge, and as to which he knows the truth, and the statement is relied upon by the other party to his injury, for in such case a fact is involved.

*Smith vs. Land, etc., Corp., 28 Chan. Div.; Stebbins vs. Eddy, 4 Mason, 423; People vs. Perkins, 153 N. Y., 576; Glaspie vs. Keaton, 56 Fed., 203.*

While it may be true, as a general rule, that a mere misrepresentation of one's opinion of what is law, or the legal effect of a document, cannot be considered a legal fraud, yet where a relation of confidence exists between the parties a misrepresentation of the legal effect of an instrument amounting to a false representation may be the foundation for an action of deceit.

*Broughton vs. Hutt, 3 Deg. and J., 501; Champion vs. Woods, 79 Cal., 17; Peter vs. Wright, 6 Ind., 183; Jordan vs. Stevens, 51 Maine, 78; Beng vs. Whitney, 40 Mich., 65; Cooks vs. Nathan, 16 Barb., 342.*

Where the misrepresentation is a misrepresentation of fact, although it may involve a representation of law, it is actionable.

*Kelley vs. Rogers, 21 Minn., 146; Rose vs. Saunders, 38 Hun, 575; Haviland vs. Willits, 141 N. Y., 35.*

It is beyond question upon authority that ordinary care and prudence do not require a person to test the truth of representations made to him by another as of his own knowledge, and with the intention that they shall be acted upon, if the facts are peculiarly within the other party's knowledge, or means of knowledge, though they are not exclusively so, and though the party to whom the representations are made may have an opportunity of ascertaining the truth for himself.

*14 Am. and Eng. Ency. of Law, 120 and 121.*

Where actual representations have been made, although the party may have made an independent investigation of the truth or falsity of such representations for himself, his action may be based upon the representation rather than his own investigation, and whether this is so or not is always a question of fact for the jury where there is evidence that he did so rely.

*Meek vs. Keene, 47 Ind., 77; Boyd vs. Shiffer, 156 Pa. St., 100; Luger vs. Schilling, 74 Wis., 369; Lee vs. Burnham, 86 Wis., 206; Morgan vs. Skiddy, 62 N. Y., 319; Potter's Appeal, 56 Conn. 1 and 19; 14 Am. and Eng. Ency. of Law, 114; Thomas vs. Grise, 1 Pennewill, 381.*

LORE, C. J.:—It is needless to say that the Court have listened with much pleasure to the very interesting arguments on the questions of law raised, branching out, as they did, into exceedingly nice questions; and we desire to thank the counsel for the clear and lucid manner in which they have presented their points.

This Court has frequently acted in granting or refusing nonsuits, upon this principle; that wherever the testimony, taken as a whole, together with all reasonable, lawful inferences that could be drawn from it, would not support the verdict of a jury, if it should find in favor of the plaintiff, a nonsuit would be granted; if it would support such a verdict, then a nonsuit would not be granted.

The Court are always very reluctant to take a case away from the jury, if there be testimony sufficient to warrant such a verdict. After a careful consideration of the testimony adduced in this case, as a whole, together with any reasonable inference that might be lawfully drawn from that testimony, this Court is forced to the conclusion that if the case were to go the jury upon that testimony alone, and the jury were to find a verdict for the plaintiff, we should be constrained to set it aside ; and for that reason, though reluctant as we may be to do so, we are compelled to hold that a nonsuit be entered.

*Mr. Hilles :*—If your Honors please, I refuse to accept a non-suit in this case.

LORE, C. J., charging the jury :

Gentlemen of the jury—In the judgment of the Court, · taking all the testimony that has been adduced on the part of the plaintiff, together with all such inferences as may reasonably be drawn from the testimony, under the well settled rules of law governing such cases in this Court, the Court have concluded that this case should not be submitted to the jury to be determined upon that testimony, and therefore instruct and direct you to return a verdict for the defendant.

(Exception noted for plaintiff.)

Verdict for defendant.